Good morning, Your Honors. My name is Lisa Lozano. I represent the Relators. I'd like to reserve 10 minutes for rebuttal. We are here because Honeywell fraudulently misrepresented the critical element, which is the heart of an energy savings performance contract. Honeywell knew this crucial element of energy savings was not practical from the outset, and thus Honeywell's misrepresentation was essential for it to get the contract, keep the contract, and get paid. Honeywell turned the Energy Savings Act on its head and induced the Army to give up a perfectly good and efficient cogeneration energy system in favor of Honeywell's inefficient solution. This has cost the United States government tens of millions of dollars and even more losses in the future, and Honeywell has been unjustly enriched to date by well over $50 million. Honeywell cannot deny that it knew from the outset that the books were cooked and it created a false baseline, even though there would be no energy savings as required under the Act. Honeywell cannot deny it because we have a recording where they have cynically admitted that they knew the books were cooked from the start. But now they are trying to escape... So, counsel, it doesn't say that, right? It says that, I think the paraphrase you're referring to is one that there was, there really wasn't an expectation that there would be energy savings. Is that fair? That's the statement from Stephen Craig in 2006. They knew that there wouldn't be energy savings from the start. Okay, so any other statement that you mean to refer to when you talk about the books being cooked? There are several statements, Your Honor. If you look at the second amended complaint, we include several admissions from other Honeywell employees and executives. The second amended complaint isn't the subject of the dismissal. No, it's not, Your Honor, but that includes additional admissions from Honeywell executives. Right, but my point is, don't we have to look at what was in front of the district court judge at the time he rolled on this motion? Certainly, Your Honor, but also the court is empowered to look to see if the relators can also provide additional information to support their claims. You're arguing on the futility, that there's no futility because you can submit the second amended complaint. Exactly, Your Honor. Does the second amended, I don't think it does, but just to be clear, does the second amended complaint refer to or incorporate the declarations? It does not incorporate the declarations by reference, but it does include in exacting detail significant information from the declarations, and specifically includes the findings from Relator Tim Berg, who evaluated the M&V, they're the measurement and verification reports that monitored the, that measured the savings after the contract. The declarations were executed in 2010 at the time of the first motion. Yes. Right, and so they're, just to be clear, I only see the one set of declarations. They weren't re-executed. There aren't new declarations with renewed motion to dismiss, are there? There are no new declarations. Those are the original ones from the subject matter jurisdiction motion to dismiss. Yes. And we included those because the court used, went off the record and relied on the AAA reports to make findings that weren't supported by the AAA report, the Army audits. And so we included the declarations to show that our complaint was well-played. Okay, so when you said the court went off those, you're talking about the? The district court. The district court's order dismissing the first amended complaint relied in part on or certainly made reference to the AAA reports. Yes. Okay. Honeywell cannot deny, as I said before, that we have a recording, but now they are trying to escape culpability and keep their ill-gotten gains by claiming the government knew or should have known of their fraud when, in fact, they misled the government. Counsel, can I stop you there? Sure. Forgive me for interrupting again, but the district court seemed very concerned about futility and specifically seemed concerned that after the AAA report or reports, I should say, were available, the contractors renegotiated. And there is case law in some circumstances indicating that when the military knows of allegations of fraud, then a false claim act isn't well-played. But there are other cases where that hasn't been the case. And so I'm not sure if you've really discussed that very much in your briefing, but could you hone in on that? Why is the district court wrong in focusing on the renegotiation of the contracts? Well, we specifically claimed in our claim, we stated that the Honeywell was not honest, forthcoming, did not fully confess that it fraudulently prepared the baseline when that renegotiation took place, wasn't honest during the AAA reports either, and the declarations include information from the relators who were part of that AAA process, that Honeywell did not provide data, that it was not, that life cycle cost analysis, for instance, information was not available, mysteriously appeared later, or sorry, they claimed that there was a fire, but then later on Stanley Smith learned that there actually wasn't a fire. And so the government never knew. There was never a confession. There was never collaboration. There was never accurate data given to the government to have government knowledge be part of the process. To say several things, to say the government never knew, I have a hard time with that, because the declarations indicate that these folks, the relators, were telling anybody they could that they thought that there was fraud afoot. Certainly, and they did. They made significant efforts, but the AAA auditors weren't engineers. There was a significant lack of knowledge of the specific engineering principles that apply, and so the relators could see it, and it was evident to them. Okay, so there's that, this allegation about the government, what the government knew. But then it seems to me there's a separate issue, because the case law talks about whether there was a real, when the government is working together to come up with data, as in this case with the baseline, we look to see whether there was a true cooperation. Was there a free flow of information? Well, under the contract, the government was only obligated to give the historicals, and it wasn't even obligated to do much work in order to give the historicals to Honeywell. So I was just getting to my question, but I hadn't quite got there yet. Oh, sure. That's all right. I wasn't clear. But my question really has to do with the baseline data, because your allegation is that the baseline data, when auditors came through and asked for where are the calculations, how did you get there, understanding that the original data came from the government. But when auditors asked for the calculations, is it your argument that that was not forthcoming? Exactly. Is that what burned up? Honeywell had the data. It created the baseline. The government gave it initial data, the historicals, and then Honeywell created data. Okay. So at what point did the government ask for those calculations so they could see how the baseline numbers were generated? Well, it wasn't able to get that honest data during the AAA audits. When, though, counsel? Well, eventually, and this was in 2005, when things started really going off the rails, the government actually contracted with a third-party auditor because the problems were so massive. And the third-party auditor, whose name is EMP2, they conducted a fraud audit. They were experts in these kinds of contracts. And they actually unearthed the fraud. They corroborated the findings of the relators, their suspicions of the fraudulent baseline. And that report was not available before the relators filed suit in 2007. It actually came out afterwards. And there is reference to that third-party audit in their declarations where the relators state that the EMP2 audit corroborated their findings of fraud. But isn't the important point that it wasn't available prior to the time the contracts were renegotiated? Can you say that one more time? For the purposes of the question we have to answer today, isn't the important point that that independent audit was not available at the time the contracts were renegotiated? Well, the problem is that Honeywell had all the power. They had all the information. They admitted they knew that their baseline, the data they created, was not accurate, was false. And so when the third-party auditor came on the scene to audit the project, Honeywell was again not forthcoming, did not provide the data. And so they had to reconstruct the baseline. And Honeywell, at the heart of this, never provided accurate data in either audits. So here's my question, and I would like to, I mean, I just asked that this is the third time, and then I'm going to give up. Okay. My question is, isn't the point that the independent audit information wasn't available at the time that the contracts were renegotiated, isn't that the point vis-a-vis the motion to dismiss or the order granting the motion to dismiss that we're ruling on today? No, it's not. I mean, there's other material in the record that supports relators' well-planned complaint. Getting even past the audit, you have fraudulent M&V reports where they falsely claim adjustments and changes in conditions, and those changes didn't exist. And they're still claiming that they want to get paid, that there's energy savings. And the relators, who actually, one of whom actually reviewed those M&V reports for the government, found that there weren't any energy savings, inspected the buildings, found that there weren't any changes in conditions, and tried to seek deductions from payments that were made to Honeywell for savings that didn't exist. So we could go on and on about the AAA, but that's just one step in the multistage fraud because it still persists. My question wasn't about the AAA audit. Maybe you can. Go ahead. Sure. Just proceed with your argument. Actually, I'd like to stop right now. Could I slip in a question? Oh, sure. As I understand, you're focusing on the time they make a claim for payment. And as I understand your argument, they knew from the beginning they couldn't measure up to the requirements, but it was later on they actually made a claim for payment pursuant to that. Is that correct? Well, the claim for payment is entering into the contract. When was the first? It's a call in the government fist. The claim is the contract because they knew from the outset that they could not perform. The claim is the contract? I thought the claim was when they actually make a request for funding. The claim is the contract. It is part of the claim. I mean, the M&B reports were incorporated into the contract. That's how they got paid was by the contract. When was the first M&B? Were they paid initially as soon as they entered into the contract? To my understanding, they were not. Yeah, it was later on. Now, at some point, the government understands the problem, and they're saying, okay, we're going to go ahead. The government doesn't understand the problem because Honeywell was never forced. I didn't say that. I said they said they understood the problem, and they want to go ahead with Honeywell instead of going someplace else. They didn't understand the problem, and they didn't say that they understood the problem. They thought. That's what I said. They thought they had enough information. You're talking a little too much about something without getting to the point. At what point did they actually make a claim for funds? The true-up deductions is what you're referring to, Your Honor. Dollars, yes. They, after M&B reports were, and that was in 2005, January of 2005, that three-year Tim Berg circulated his reviews of Honeywell's M&B reports. But Honeywell got paid in 2004. At that point, did the government know that there had been a problem on the baseline? The relators did. They initiated the AAA. Did the government know at that time? They didn't know that they were duped. Did they know the baseline was wrong? They did not know that the baseline was fraudulently wrong. The counsel, the question that Judge Wallace is asking is really simple, and the AAA audit told them the baseline was wrong. The baseline was wrong, but it didn't say the extent of how it was wrong or really that it was wrong because Honeywell manufactured it. It's not an insignificant point, and this is feeling like a lot of work to try to get these answers, but it's why the district court was focusing on mathematical errors. And I understand, and everybody in this room understands, that your view is that it was more than that, that it was fraudulent, right? Indeed. But as of the first AAA report, they knew the baseline was inaccurate, right? Yes. Honeywell convinced the government that it was a mutual mistake, that the government had made mistakes in giving historical information to Honeywell and that they were at fault for that baseline. But that's not what really happened because ultimately the losses were significantly greater than the AAA report discovered. AAA was pre-project. It was before there was actually measurement reports about what was going on on the base, so they really couldn't discover the massiveness of the fraud. And ultimately the Army got so frustrated with how Honeywell was executing this contract that they hired that third-party auditor who ultimately corroborated realtor suspicions and had to reconstruct the baseline because they couldn't get accurate data from Honeywell. It was not forthcoming to them. So there wasn't a full confession. And that's the entire basis of government knowledge. There has to be collaboration. There has to be full confession. And Honeywell never said, and it's not in the AAA reports, as Tim Berg states in his declaration, they cherry-picked data from two anomalous weather years. They rigged DOE software. It's the strongest case law support for your statement that there has to be collaboration, the Butler case? The Butler case and, Your Honor, give me a moment. There is another case. I think if you give me a moment I can cite the other cases. I have them just not offhand. But there are other cases where collaboration, and I think it's in the Tenth Circuit as well, is a basic part of a negotiation. All right. Thank you, counsel. Thank you. Good morning. May it please the Court, my name is Teresa Bevilacqua, and I am here on behalf of the Honeywell defendants in the action below. And I want to pick up on the Court's questioning because it really goes to the heart of what a False Claims Act claim is and what must be pleaded. Your Honor was asking about when was the first claim for payment made. The first claim for payment was submitted in October 2004, which was after the contract modification consolidating the two task orders, and it was after the AAA reports were issued by the Army Audit Agency, which detailed a number of errors in the baseline calculations. So at the time the first claim for payment is made, the government already knows that there are problems with the baseline. So if your position was nice, I think I understand your position. Regardless of what may have happened before, at the time you made a claim for dollars to be paid, the government was well aware of all of those problems, so there can't be a claim. Correct. That's your position. Okay. And I understood that and I read through and, well, that makes sense. They aren't asking for money and the government knows what they're doing. They thought the best way was to go this way, fine. And then I came across one of our opinions that I hadn't been aware of before in the United States' X. Ralph Hendon versus University of Phoenix, an opinion by Judge Hall. And it did away with that analysis completely and talked about that if there's a false statement is integral to the causal claim leading to payment, it is irrelevant that the federal bureaucracy has apportioned the statements among layers of paperwork. And she talks about fraud and the inducement, that is that the claim at the very beginning, even though you asked for no money, she says, and she was speaking for our court, that under this statute if they're at the very beginning, if Honeywell knows there's a problem and they go ahead at that point, she analogizes that to fraud and the inducement. And we don't even get to your argument of those individual payments. And maybe you ought to tell me how you deal with that case. Yes, and I would like to talk about it in a couple different ways. And the first is the implausibility of relators' fraud and the inducement theory based on the records that relators have created. So I want to look at it from that way to put it in perspective and in the right perspective with the authority Your Honor has cited. So setting aside 9B, which is actually a very large problem for relators in this case, but if we just start with plausibility under Rule 8, Iqbal and Twombly, and this Court's precedent in the Cofaso case, it says that the theory of fraud and inducement has to be plausible. Here, the task orders and the overall energy savings performance contract from 1997 are contracts that state very explicitly Honeywell does not get paid and cannot get paid unless and until there is demonstrable energy savings. And that's right in the record at our excerpts 10 through 12 and 41. It's explicit language in the contracts. The contracts require three different kinds of calculations. There's the baseline calculation, which is the pre-conversion cost, what it's costing today to run the energy or what they're buying or however they're generating their power. And that is an approximation of current costs, and that number is based on data and information provided by the government. And while it's based on historicals, it is not 100% historical information. There are other variables that go into that component. The second calculation is the post-conversion energy cost estimate. So what is it going to be after we do all of the conversion? And then afterwards, once all of the conversion is complete, there's an actual number that says here's what it's costing the government today, which is sometimes referred to as the measurement and verification. You're measuring and verifying what the actual costs are today. In order for Honeywell to get paid under the contract, there has to be that delta between the baseline and the actual. And without it, the contract says Honeywell doesn't get paid. Nor is Honeywell entitled to a renegotiation unless the government determines that the government was at fault in something it did. It's expressed in the language of both the energy savings performance contract and the task orders. Counsel, we've read all the briefs and understand these concepts, I think, really thoroughly. So do you want to scoot to the answer to Judge Wallace's question? Yes. So the theory that they put forth on fraud and the inducement is that – I think Judge Wallace asked you to address a case that was written by Judge Hall about fraud and the inducement. Right. And it's – but their theory of fraud and the inducement doesn't make sense. You could state a claim under the FCA and under this court's precedent. Well, it does make sense, actually. Whether or not they fled it with sufficient particularity in the complaint that's currently under review, it does make sense that you would come in with higher cost savings as an inducement to get a government entity to hire you as opposed to your competitor to do a long-term job, which this is. Yes, but the theory set forth by relators is that we did it knowing we could never demonstrate the savings. And it also assumes that we would have to be able to successfully renegotiate in the future in order to get paid, and that's the missing piece. Well, that part doesn't bother me so much because isn't it – after Honeywell's installed all this equipment and everything and it's not – they're having problems with it. Isn't it – I mean, isn't the – I guess the default is to renegotiate in order to solve the problems that are in there, not to pull out all the equipment and start all over back where you were in 1977? Or – People – once you're in, you know, people tend to want to get it fixed or the same people get it fixed and not start all over again and get new equipment, and that would be a costly failure. And it's still possible to finish the installation and not pay the contractor for savings going forward on the contract where no savings exist. You can still have the contractor finish the installation, and so you are not entitled to payment under the contract if the government actually determines there's a fraud. So as I understand our case law on the government's knowledge defense, it's – we've said in many cases that it's actually an intensive background inquiry. Are you aware of a single case involving the government knowledge defense where the defense was used to dismiss a complaint under 12b-6? On a motion to dismiss, Your Honor, post-Butler, no. I'm sorry, post-Haygood, no, I'm not. They're mostly in the context of a directed verdict or summary judgment in this court. Aren't there a lot of facts that have to be developed? I mean, it seems to me that you would have to say but show what the government knew and when they knew it as your defense. I mean, as I understand, you haven't even filed an answer. That's correct, Your Honor. So how can you even have asserted the government knowledge defense yet actually as a procedural matter? What we have done is raised the issue as a legal issue before the court as a basis for futility on amendment, and let me explain why that is. Well, let me just point out that the Second Amendment complaint alleges that Honeywell engineer Jim Peden, who prepared Honeywell's initial proposal, admitted in February 2007 that Honeywell knew from the start that the project would never save money. And that allegation, this goes back to the complaint that's actually on file and what brings us here today, is that allegation and the other one that's similar to it in the first complaint, the Steve Craig allegation, failed to plead fraud with the requisite particularity under 9b. It fails to state who knew, how they knew, what they knew, what about the baseline and the information they got from the government Honeywell could possibly know was wrong or inaccurate when it submitted the baseline calculation. And if you look at that allegation in the Second Amendment complaint, it actually says that he says it in 2003, and that's three years after the task orders are issued, and it's when the AAA investigation is ongoing and it's already been demonstrated that there's a shortfall. So it doesn't match up in terms of timing. The difference between mistakes were made and intentionally defrauding the government, and I think that's what your opposing counsel is trying to say. Counsel, you said earlier in response to Judge Wallace's question that you said the government was well aware of all the problems before the first payment was made, but that was in 2004, I think. Correct, Your Honor. Well, the declarations indicate they itemized several problems that weren't unearthed until 2005, 2006. So how do I factor that in? In a couple different ways. One, the fundamental claim being made by relators is that the baseline was set too high and the savings were not enough, so there were no savings. Honeywell should not have been paid. And that fundamental error, regardless of how many different component calculations they identified that led to that error, that overall fundamental error was known by the government in 2003. It was known by a magnitude of $1.4 million. But it's not. We're talking about different things. I'm sorry, Your Honor. The AAA, that's okay. The AAA report said really clearly that the baseline was wrong. It was inaccurate, to Judge Wardlaw's point. But, of course, the relators claim it was not only wrong but fraudulent. And your comment in response to Judge Wallace's question is that the government was well aware of all of the problems before the first payment was made, but their application, again, we're just at the outset of this lawsuit. We're not at summary judgment. We're not at to go back to Judge Wardlaw's point. There's a lot of facts here that seem to be unresolved. But the facts, as alleged by the plaintiffs, are that other problems that indicate true fraud were not unearthed until 2005 and 2006. And none of those problems, Your Honor, actually appear in the operative pleading. None of the allegations appear in the second amended complaint but for two or three. Okay, so now we're back to the 9B problem. Correct. Okay, so then if I could ask you to answer for me. Since these declarations are on file and they were since the first motion to dismiss, why was it appropriate to dismiss without granting leave to amend? Because the court had in its possession these declarations and they were given, excuse me, relators had an opportunity to draft a new proposed second amended complaint. With these declarations, the declarations predate the proposed second amended complaint, and they didn't put in the required specificity to state a claim for 9B in either the first or the second amended complaint. So is it your position, counsel, that because if this was dismissed on the basis of futility, is it your position that the requisite specificity cannot be found in the declarations? Or just that it wasn't transported into the second amended complaint? The former, Your Honor. Because what the declarations do is they say what the relators have claimed to discover in their review. What the relators need to do to state a claim under the FCA is show that what Honeywell did during the process, and let's just take the original baseline calculation, was knowingly false at the time. There has to be some indicia and some actually specific facts pleaded that Honeywell, a person, not just corporate knowledge, general corporate knowledge is not enough. So we've heard in declarations, is it really your position that none of the allegations in the declarations include the who, what, when, where? That's correct, Your Honor, because they don't tie it back to any Honeywell employees. Let's take, for example, the software. I think it's instructive. They say Honeywell intentionally knowingly overwrote Department of Energy software. It doesn't say who. It doesn't say when. It doesn't say what values were changed or what individuals within Honeywell had knowledge that it was inappropriate to change these values. Moreover, the government knew at the time what software Honeywell was using. It's specified in the record. But, Counsel, you keep shifting. Now you're going to a different basis. I was asking about the who, what, when, where, and now you're going back to what the government knew. So that's a different argument. I'll stop there. So to go back to who, what, when, where, they don't specify. They say we as relators, employees of the government, are looking at this and saying it is wrong after the fact. It doesn't specify who at Honeywell knew it was wrong when it was submitted to the government. And that is the essential failing for the failure to plead fraud with particularity. It doesn't say who. It doesn't say how. It doesn't say when. It says Jim Peden and when he knew from the beginning. It seems as though on this government knowledge defense, the district court was kind of making findings of fact here, like kind of getting ahead of himself. I mean, they might totally lose on that defense, but, I mean, you haven't even pleaded it. Well, and it is part of, it's not an affirmative defense that actually gets pleaded. That's not what it is. It's actually, it goes directly to the falsity. Once government knowledge and cooperation, collaboration with the government is established, however that is established, and it doesn't have to be by the defendant. You wouldn't put that in your answer? We would put it in our answer, Your Honor, yes. But it is not an affirmative. Okay, that's what I'm talking about. I didn't, you know, I didn't say it was an affirmative defense necessarily. I said you would put it in your answer. And then somebody at summary judgment or at a trial would decide, some facts binder, whether the government had knowledge. Not when we're just looking, has a claim been stated? Although I have to say the plaintiffs here could have taken all this information and put it in one document, and it would have made it easier. And the key thing that is still missing from that document is exactly how Honeywell perpetrated this from the beginning. Who knew, how they knew it, and what was false at the time? What made it false at the time? Those allegations are missing, and those allegations, other than the conclusory characterization after the fact in 2007, that Jim Peden said he knew at the time it wouldn't create energy savings. Your Honor, your time counts. Thank you, Your Honor. Excuse me. Yes, Your Honor. I wanted to finish my question, if I could. Going back to the fraud and the inducement, what did the district court find on that issue, or did the district court look at that issue? The district court did look at fraud and the inducement, and my understanding about what the district court found is that it failed to meet the particularity requirements of 9b. It was not based on the government knowledge exception. It was based on failure to plead fraud with particularity. Show me in the opinion of the district judge, if you would, please, what page that's on where they talk specifically about fraud and the inducement. Yes, Your Honor. It is at ER 10, beginning in the second paragraph. Use the numbers of the opinion. Page 9 of the district court's opinion. Thank you. And whereabouts is that? It starts in the second paragraph. Okay. The second sentence, under a fraud and the inducement theory under FCA, liability can be triggered when fraud is used to obtain a government contract. So he recognizes the principle Your Honor was talking about. He describes the theory and then talks about the reasons why it was insufficient for this complaint, and he says what was pleaded here is innocent mistake, scientific error, and none of the particulars of the who, what, when, where, and fraud going on to page 10, Your Honor. Thank you. I'll give you two minutes. Thank you, Your Honor. I'd like to go back to one of the questions the court had, and on further reflection, this is Judge Christian's question, because at the time of the renegotiation, the government did not have knowledge of either the fraud and the inducement or the magnitude of the problem or the lack of mutual mistake. The fact that there was no energy savings, the answer is yes. So their argument is, well, if they really believed there was not going to be any energy savings, why would they enter into this contract at all? Right. The government, you mean? Well, that was the initial step to get in the door to get the contract and then execute the rest of the stages of its fraud. But opposing counsel is right, isn't she, that that would all be premised upon their ability to renegotiate later to convince the government that part of the error was due to the government. If they hadn't done that, they wouldn't have been paid, right? That's exactly how they perpetuated their fraud. So the answer is the answer yes? Yes. If they hadn't done that, they wouldn't have been paid? Yes, they had to convince the government. And further, Honeywell wasn't entitled to renegotiation by virtue of its unclean hands. It can't claim mutual mistake and have fraud at the same time. They're mutually destructive, and we've gone through that in our brief. There's no way that they could have justified a renegotiation. As to the court's question regarding other cases on government knowledge, there's good ones. Earl Baugh, and I believe that's Fourth Circuit, said that the focus is on the depth of the government knowledge and the extent it invited the claim. And in that case, the government had access to data, and there was no indication that the data was inaccurate, and it reviewed the data. There's another case, Shaw, which said that government knowledge is only applied when the knowledge is so extensive that the contractor would not, as a matter of law, and then Kellogg-Brown, I believe that's a D.C. Circuit case. In that matter, the government and the contractor at the pleading stage disagreed about whether there was a reasonable disagreement about the nature of the contract. The court said when faced with competing claims, the court is to draw inferences in favor of the non-moving party.  Thank you, Your Honor. Berg v. Honeywell is submitted, and we'll take up Locano Investments v. Dan Sullivan.
judges: Wallace, Wardlaw, Christen